UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRIDGET L. WILLIAMS,

                Plaintiff,

                              **Hon. Hugh B. Scott**

      v.                          10CV32A

                              **Report
                              and
MICHAEL J. ASTRUE Commissioner of    Recommendation**
Social Security,

                Defendant.

Before the Court is defendant's motion for judgment on the pleadings (Docket No. 8); plaintiff did not file a motion.

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security that plaintiff is not disabled and, therefore, is not entitled to disability insurance benefits and/or Supplemental Security Income benefits.

## PROCEDURAL BACKGROUND

The plaintiff, Bridget Williams, filed an application for disability insurance benefits on January 10, 2007. That application was denied initially and on reconsideration. The plaintiff appeared before an Administrative Law Judge ("ALJ"), who considered the case de novo and concluded, in a written decision dated July 30, 2009, that the plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the

Commissioner on November 13, 2009, when the Appeals Council denied plaintiff's request for review.

Plaintiff commenced this action on January 12, 2010 (Docket No. 1). Defendant commissioner then moved for judgment on the pleadings (Docket No. 8), to which plaintiff eventually responded (Docket No. 17), and the defendant replied (Docket No. 19). On the strength of these papers, the parties sought to submit the motion without oral argument and the Court agreed, submitting it on the papers on November 15, 2010 (Docket No. 20).

## FACTUAL BACKGROUND[1]

Plaintiff is a single mother of three children who claims to have depression and anxiety as well as blindness in her right eye. This appeal centers on her depression and anxiety claims. She was born in 1971 and has a ninth grade education which includes attending special education classes. Plaintiff last worked in 2005 as a cashier and hostess at a restaurant; the parties dispute the import of her reason for no longer working there. Defendant contends she was fired for poor attendance (Docket No. 9, Def. Memo. at 12; R. 23-24), while plaintiff argues that she had panic attacks and that she was fired, and the poor attendance and panic attacks were consistent (see Docket No. 17, Pl. Memo. at 4).

## MEDICAL AND VOCATIONAL EVIDENCE

The parties agree with defendant's presentation of the procedural history (Docket No. 9, Def. Memo. at 1-2) and the recitation of the facts of the medical evidence (id. at 2-12; see Docket No. 17, Pl. Memo. at 1, 2). Due to the nature of plaintiff's claimed impairment, that she had

---

[1] References noted as "(R.__)" herein are to the certified record of the administrative proceedings. Defendant in his submission refers to this record as "Tr." while plaintiff refers to the same record as "tr."

"marked restrictions" in her activities of her daily life, a detailed recitation is necessary of her daily activities and treatments. According to defendant (Docket No. 9, Def. Memo. at 2-12) and accepted by plaintiff (see Docket No. 17, Pl. Memo. at 1, 2),

> Plaintiff sought counseling for depression at the Niagara County Mental Health Clinic in April 2004 (Tr. 210, 338). She saw Diane Kraft, a licensed social worker, for counseling about every two to three weeks for the rest of 2004 and throughout 2005 and 2006 (Tr. 210, 265-306). She also saw a psychiatrist, Dr. Ramon Tan, beginning in June 2004, and continued to see him during 2005 and 2006 for medical evaluation, about every three months (Tr. 210, 256, 259-60, 328-37). Dr. Tan prescribed medications and advised her to continue therapy (Tr. 328-39). The record contains extensive progress notes of her therapy sessions, which focused on issues regarding her relationship with her daughter, and her relationship with her boyfriend, who is the father of her second child, a boy born in January 2005. Id.
> 
> In Ms. Kraft's updated treatment plan on January 23, 2007, she noted that the goal was for plaintiff to improve her self-esteem and improve management of her depressive symptoms (Tr. 307). Plaintiff's strengths were that she was engaged in treatment; she accepted prescriptions; she was willing to process issues; and she had some social support. Id.
> 
> Plaintiff saw her therapist, Ms. Kraft, in January, February, and March 2007 (Tr. 309-11). Plaintiff and Ms. Kraft discussed issues regarding plaintiff's children and plaintiff's shoplifting incident at a grocery store. Id.
> 
> Thomas Ryan, Ph.D., evaluated plaintiff on March 2, 2007 (Tr. 202-50). Plaintiff reported that she received counseling since 2003 and she saw a psychiatrist every three months (Tr. 202). She was taking Celexa, buspirone and Ambien. Id.[3] Plaintiff denied any current or past alcohol use (Tr. 203). She stated that she last used Cocaine six years ago and had been drug free since then. Dr. Ryan stated that plaintiff was cooperative and her manner of relating, social skills, and presentation were "somewhat poor." Her eye contact was appropriate. Plaintiff's thoughts were coherent and goal directed without evidence of hallucinations, delusions, or paranoia (Tr. 203). Plaintiff had "some" range of affect. Her affect was appropriate to her thought content, with underlying anxiety. Id. Her mood was neutral (Tr. 204). Plaintiff was oriented to person, place and time. Id. Her attention, concentration and memory were intact. Her cognitive

---

[3]Celexa is an antidepressant. http://www.drugs.com/celexa.html. Buspirone (Bus par) is an anti-anxiety medicine. http://www.drugs.com/buspirone.html. Ambien is used for the short-term treatment of insomnia. http://www.drugs.com/ambien.html.

functioning was in the low average range. Dr. Ryan concluded that plaintiff could follow and understand simple directions, perform simple tasks and maintain attention and concentration. She could learn new tasks and may have some difficulty with complex tasks. Her decision-making ability was somewhat impaired. Plaintiff could maintain a regular schedule. She may at times have some difficulty dealing with others and dealing with stress. Id. Dr. Ryan diagnosed plaintiff's condition as reported cocaine abuse, in remission; depressive disorder, not otherwise specified; and impulse control disorder (Tr. 205).

Dr. Dave Nikita conducted a physical examination on March 2, 2007 (Tr. 206-09). Plaintiff stated that she had been blind in her right eye since childhood and she reported a history of depression, anxiety and panic attacks (Tr. 206). Plaintiff's vision was 20/200 in her right eye and 20/20 in her left eye (Tr. 207). At twenty feet, plaintiff had 20/20 vision uncorrected on a Snellen chart. Id. Physical examination was unremarkable (Tr. 207-08). Dr. Nikita diagnosed plaintiff's conditions as right eye blindness since childhood as well as depression, anxiety, and panic disorder (Tr. 208).

On March 20, 2007, Ms. Kraft completed a report based on her last session with plaintiff on February 28, 2007 (Tr. 210, 214). She noted that plaintiff had depression, not otherwise specified; anxiety, not otherwise specified; a probable eating disorder; and substance abuse in remission (Tr. 210). She had impulsivity and panic attacks, especially when under stress, which affected her functioning (Tr. 212, 214). Ms. Kraft observed that plaintiff had good grooming and hygiene (Tr. 212). Plaintiff was cooperative. Her speech was clear and there was no evidence of psychosis. Plaintiff's mood and affect were anxious. Id. Plaintiff was oriented to person, place and time (Tr. 213). Her attention and concentration were impaired, especially when she was under stress (Tr. 213, 214). Plaintiff's long-term memory was essentially intact and her short-term memory was impaired, especially under stress (Tr. 213, 214). Plaintiff's insight and judgment were fair and impaired under stress (Tr. 213). Plaintiff's anxiety and mood lability affected her socialization (Tr. 214).

Ms. Kraft completed an updated treatment plan on April 9, 2007 (Tr. 312). The goal was to improve management of plaintiff's affective symptoms and to continue helping her with impulse control in light of her recent arrest for shoplifting. Plaintiff was engaged in treatment, accepted her medications, and was willing to work to make changes. Id.

Dr. Tan saw plaintiff on April 11, 2007 (Tr. 326). Plaintiff reported that overall, she had been "fair" emotionally, mentally and physically. Plaintiff had occasional increase in feelings of anxiety and panic, which were primarily a reaction to stressors and coping with her fourteen year old daughter. Dr. Tan reported that plaintiff was alert and she did not appear depressed or anxious. She had no delusions, hallucinations, self destructive or aggressive feelings, or "acting out." Dr. Tan recommended maintaining plaintiff on her current medications, on which she was relatively stable. He noted that plaintiff was

responsive to support. Id. Dr. Tan opined that plaintiff was able to attain employment, but she would be unable to maintain it due to panic attacks and anxiety (Tr. 254).

Dr. Tan signed a medical form in July 2007 (Tr. 253-54). He noted that plaintiff was not taking psychotropic medications due to her pregnancy (Tr. 253). Dr. Tan opined that plaintiff's abilities to understand, remember and carry out instructions, interact appropriately with others, and function at a consistent pace were moderately limited. With respect to plaintiff's ability to maintain socially appropriate behavior, Dr. Tan marked the box between moderately limited and very limited. With respect to plaintiff's ability to make simple decisions and maintain personal hygiene and grooming, Dr. Tan marked the box between "no evidence of limitations" and "moderately limited." Id.

Dr. M.S. Rahman, a State Agency psychiatric consultant, reviewed available evidence, including the reports of plaintiff's therapist, Ms. Kraft and Dr. Ryan. On May 14 and May 17, 2007, Dr. Rahman concluded that plaintiff would be able to understand and follow simple directions, maintain attention and concentration for simple tasks, and perform simple rote tasks in low contact settings (Tr. 219, 239).

Plaintiff continued therapy with Ms. Kraft from May through October 2007 (Tr. 358-74). Plaintiff complained of feeling irritable at times. She was pregnant and was not willing to take medications for fear of harming her baby (Tr. 358, 373). Sessions focused on issues relating to her shoplifting charge, budgeting money, and her relationships with her daughter and her boyfriend (Tr. 358-74).

Plaintiff had her third child in December 2007 (Tr. 375).

Plaintiff continued therapy sessions with Ms. Kraft during the period from February 15 to May 30, 2008 (Tr. 375-83). At the February session, she admitted to a brief period of alcohol abuse, but stated that she had since remained sober (Tr. 375). The sessions focused on challenges that plaintiff had with her teenage daughter, who had been skipping school and defying plaintiff (Tr. 373, 375, 379, 383). She admitted to a one-time use of crack cocaine on March 13, 2008 (after eight years of sobriety) to relieve abdominal pain (Tr. 377). She expressed remorse for doing so and stated that she had no desire to do it again (Tr. 377, 379).

On July 6, 2008, plaintiff was brought to the emergency department of Niagara Falls Memorial Medical Center for a possible overdose (Tr. 316, 318). Plaintiff had taken Percocet for back pain, but denied that it was an intentional overdose. She stated that she was feeling increasingly depressed due to pain and nobody would prescribe medication. She stated that she was taking her prescription Klonopin and had been drinking, but she later denied that. Plaintiff denied any issues of lethality and stated that she never intended to harm herself (Tr. 316, 318). A urine toxicology screening was positive for cocaine (Tr. 316, 318). Plaintiff was hospitalized from July 6 through July 10, 2008 (Tr. 316-17).

5

Plaintiff was alert and oriented to person, place and time. She was cooperative. Her speech was described as soft and underproductive. Plaintiff's affect was blunted. Her thought process was goal directed. Plaintiff denied any issues of lethality during her hospital stay (Tr. 316, 317, 318). Plaintiff was given Flexeril for pain and Cymbalta, which decreased her depression (Tr. 317). Plaintiff's boyfriend was comfortable with plaintiff's discharge and he and his mother would help plaintiff take care of her children. Plaintiff was discharged in stable condition. Id. The discharge diagnosis was depressive disorder, not otherwise specified and polysubstance dependence.

After her hospitalization, plaintiff saw Ms. Kraft on July 15, 2008 (Tr. 385). Plaintiff stated that she had been having difficulties with her teenage daughter and difficulty with stress. She stated that she felt overwhelmed at times. She continued to have difficulty with impulsivity, particularly when she was upset, and she had some self-abuse behavior (cutting). However, plaintiff denied suicidal ideation (Tr. 385). Ms. Kraft recommended continued individual counseling every two to four weeks and medical evaluation every three months (Tr. 386).

Plaintiff saw Dr. Tan on August 11, 1008 (Tr. 323). Dr. Tan stated that plaintiff was alert and she did not appear depressed or anxious. She had no delusions, hallucinations, self destructive or aggressive feelings, or episodes of "acting out". Dr. Tan recommended that plaintiff discontinue Klonopin because of her recent cocaine problem. Dr. Tan advised plaintiff to keep taking Cymbalta and Ambien, restart Buspar and continue therapy. Id. Plaintiff continued to see Ms. Kraft from July 28, 2008 to October 23, 2008 for counseling (Tr. 387-97). During this time, she had not used any alcohol or non-prescription drugs, and stated that she had not done so since her hospitalization in early July 2008. Plaintiff's mood was generally described as anxious and on one occasion it was described as bright and on another occasion as euthymic (Tr. 388, 394).[4] She made progress with treatment and had been able to think through situations and make better decisions (Tr. 392).

Plaintiff saw Dr. Tan on November 24, 2008 (Tr. 322). She did not appear depressed or anxious and her mood was stable. Plaintiff exhibited no delusions, hallucinations, self destructive or aggressive feelings or "acting out." Dr. Tan advised plaintiff to continue her medications and therapy. Id.

On November 26, 2009, Dr. Tan marked a box noting that plaintiff was unable to work (Tr. 252).

Plaintiff saw Ms. Kraft on January 13, 2009 (Tr. 400). Her mood was described as depressed and anxious. She had stopped taking her medications, except for Nexium, "for no reason." Id.

---

[4]A euthymic mood means that the individual's mood is in the "normal" range, i.e., neither depressed nor elevated. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 825 (4th ed., text revision, 2000).

6

Plaintiff returned to Niagara County Mental Health on March 9, 2009 and saw Dr. Fernando, a psychiatrist (Tr. 321). Plaintiff complained that she experienced mood swings and she was irritable and angry at times and depressed at other times. Dr. Fernando stated that plaintiff exhibited no psychotic symptoms and observed that her speech was voluble and somewhat hyperactive. Id.

The record contains notes of plaintiff's therapy sessions with Ms. Kraft from March 10, 2009 to June 5, 2009 (Tr. 402-10). Plaintiff's mood was described as anxious. Sessions focused on dealing with stress, particularly with regard to her children. Id.

Dr. Esat Cirpili, a psychiatrist at Niagara County Mental Health Clinic, completed a report on June 10, 2009 (Tr. 411-17). He noted that plaintiff had been treated there since April 2004 with psychotherapy and medication management, and that she had been diagnosed with a depressive disorder, an anxiety disorder, probable eating disorder, substance abuse, in remission, and personality disorder (Tr. 411). Dr. Cirpili noted that plaintiff had recently started taking a mood stabilizer and the diagnosis may be changed to bipolar disorder. He stated that plaintiff had achieved sobriety in 2001 and had sustained it until March 2008, with a single episode of drug use (Tr. 415). She had a second single episode in July 2008, but she did not use drugs since. Id. Dr. Cirpili stated that plaintiff's mood lability, low frustration tolerance, irritability, and anxiety persisted despite absence of drug/alcohol use (Tr. 416). He stated that plaintiff was unable to perform even a low stress job (Tr. 416). Dr. Cirpili noted that plaintiff attempted to work and was successful at obtaining employment, but she was unable to sustain employment because she became easily overwhelmed by job demands (Tr. 417).

(Docket No. 9, Def. Memo. at 2-12.)

Plaintiff, however differs as to vocational and other evidence in the section of defendant's brief (cf. Docket No. 9, Def. Memo. at 12-14) that contends that defendant did not consider her initial allegations about her activities of daily life, or "ADLs" (Docket No. 17, Pl. Memo. at 2). Here is plaintiff's statement regarding her activities of daily life:

Plaintiff originally alleged difficulties with her ADLs on the "function report" that is sent out by State Agency to every initial applicant. She stated that she didn't go out too often in winter, only for appointments, but did go out in nicer weather if she didn't have any anxiety. (tr. 140) She also stated that she either could not sleep for days or slept too much at times to "avoid life." (tr. 138) She shops only when necessary and "makes it quick". (tr. 141) She stated that she does not spend time with others and that her family "does not understand".

7

(tr. 142) When she does go out, she stops walking after a few minutes, wishing she was back home and has to convince herself that "no one is looking at me". (tr. 143) Stress or schedule changes throw her off (tr. 144) and she has a great deal of difficulty remembering even simple things like the baby's sippy cup. (tr. 144) She doesn't remember dates and times, gets "hyper" in a crowd and wishes the world would go away. (tr. 144)

      Her medical records are very consistent with her above statements. For example in April 2004, her counselor states that Plaintiff was very anxious during her session because she gets nervous when she leaves the house. She continues that Plaintiff might want to go out to do something, but once outside, gets very fearful. (tr. 340) Later treatment notes show an inability in coping with stress by destructive behaviors like purging (tr. 358), throwing a plate in the kitchen (tr. 360), shoplifting (tr. 365), a onetime use of crack after eight years of sobriety (tr. 379) and cutting herself. (tr. 379) She also showed some obsessive behavior by taking four baths per day and getting upset if things were not in order or clean at her house. (tr. 398) In March 2009, she remained impulsive, easily angered, and even hit a wall in anger and hurt her hand. (tr. 403) Throughout her counseling, these types of concerns occur regularly.

      At her hearing, she testified to how her anxiety contributed to having problems with her ADLs. She stated that she had panic attacks when she was working, which caused her to be unable to do her job. (tr. 26) The panic attacks also effect things like grocery shopping or even leaving the house. (tr. 28) The ALJ noticed that she had a little baggy of diaper wipes, and she stated that she used them to sanitize areas including the hearing room, the bathroom, and in the waiting area, so that nothing dirty touches her. (tr. 30) She even used the wipes on the parking meter. (tr. 31) She takes one shower and three to four baths per day, and changes her underwear several times each day, even if she is not leaving the house. (tr. 31) She does her housework for two reasons. First there is no one else to do it and more importantly, she cannot function, including eating or drinking, if the house is dirty. (tr. 31-32) If someone even coughs near her children, she sprays Lysol all over them, and wipes them down. (tr. 33) She detailed other obsessive behavior in cooking and eating also. (tr. 34) She stated that shopping was difficult, due to anxiety issues. (tr. 35) She testified to panic attacks, one so severe on the drive to the hearing [over a bridge], that she was drenched [from sweat] and had to redo her hair at the hearings office. (tr. 37) She stated that she has been in counseling with Niagara County Mental Health since 2004, and that she really depends on her counselor to help her with things, and that her counselor also got her a case manager [from Family and Children's] to assist her also with coping with things. (tr. 40-42) She conclude her testimony by saying that instead of good and bad days, she only has bad days and ok days; She never really has good days. (tr. 48).

(Docket No. 17, Pl. Memo. at 2-4.)

Defendant contends that

> Plaintiff testified that her medications made her a little calmer and took "the edge off," but not enough to function (Tr. 27). She did not have side effects from her current medications (Tr. 45). Plaintiff testified that her therapist was very helpful and she shared everything with her therapist (Tr. 40-41). Plaintiff believed that her condition worsened and that her panic attacks had become more frequent (Tr. 28). She also stated that she had episodes of mania all day (Tr. 28, 40). She found that the stress of taking care of her three children, ages sixteen years, four years, and eighteen months, brought on her symptoms (Tr. 23, 28, 40).
> Plaintiff testified that she had panic attacks on the morning of her hearing (Tr. 37). She stated that when she had panic attacks, she felt "sweaty, wet, drenched, scared" and "constricted," and she had difficulty breathing (Tr. 37-38). Plaintiff last used drugs (cocaine) in July 2009 (Tr. 29). She stated that except for that one-time use, she had not used drugs since 2001. Id.
> Plaintiff cared for her three children (Tr. 23, 28). She stated that her teenage daughter was difficult and did not want to attend school (Tr. 42-43). Her youngest son had started walking and required a lot of attention (Tr. 43-44). Her four year old had development delays. He went to school for several hours a day and was home by lunch (Tr. 46, 47).
> Plaintiff stated that she constantly cleaned her home (Tr. 31-32). She wiped down door knobs, toilet seats, and other public areas (Tr. 30-31). She testified that she bathed several times a day and changed underwear about four times a day (Tr. 31, 138). Plaintiff was independent in grooming and self-care (Tr. 204, 206). She cooked for herself and her children and did laundry (Tr. 33, 36, 204, 139). Plaintiff grocery shopped (Tr. 35, 204). Sometimes she had difficulty shopping because the aisles felt small and cluttered, and she felt better shopping with her boyfriend (Tr. 35). Plaintiff kept a journal as part of her therapy (Tr. 43, 44). She stated that she loved to read, but she did not have a chance to read anymore (Tr. 47). She managed her money (Tr. 204). She socialized with a friend, and saw her boyfriend and her family. Id. She enjoyed reading, watching television and listening to the radio (Tr. 204, 206).

(Docket No. 9, Def. Memo. at 12-14.)

The ALJ concluded that plaintiff had a residual functional capacity to perform simple, unskilled work at all exertional levels (R. 14; Docket No. 9, Def. Memo. at 18), accepting the views of evaluating professionals Drs. Ryan and Rahman while giving little weight to the opinion of plaintiff's treating physician, Dr. Tan (R. 15-16; Docket No. 9, Def. Memo. at 18-21) and

9

finding that plaintiff's claims as to the intensity, persistence, and limiting effects of her symptoms were not credible because she made conflicting statements when detailing her symptoms and behaviors from five years before (R. 16). The ALJ found that Dr. Tan's treatment notes were inconsistent with his opinion that plaintiff was unable to work (R. 16, 252, 254; Docket No. 9, Def. Memo. at 21). Plaintiff's therapist, Ms. Kraft, also noted that plaintiff's symptoms were stress-related from causes other than her depression (Docket No. 9, Def. Memo. at 22; R. 16). Kraft rated plaintiff's Global Assessment of Functioning at around 55, which indicated only moderate difficulty in social or occupational functioning (R. 303-13, 358-76, 379, 383, 385, 387, 388, 390, 391-400, 403; Docket No. 9, Def. Memo. at 22-23; Docket No. 19, Def. Reply Memo. at 3-4). Dr. Tan noted that plaintiff's symptoms fluctuated when she skipped her medication and the ALJ found that her condition was controlled by medication (R. 326, 16; Docket No. 19, Def. Reply Memo. at 4).

**DISCUSSION**

The only issue to be determined by this Court is whether the ALJ's decision that the plaintiff was not under a disability is supported by substantial evidence. See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)).

*Standard*

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing that her impairment prevents her from returning to her previous type of employment. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." Id.; see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

> (1) whether the plaintiff is currently working;
>
> (2) whether the plaintiff suffers from a severe impairment;
>
> (3) whether the impairment is listed in Appendix 1 of the relevant regulations;
>
> (4) whether the impairment prevents the plaintiff from continuing her past relevant work; and

> (5) whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; Berry, supra, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). However, it should be noted that the ALJ has an affirmative duty to fully develop the record. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). When the plaintiff's impairment is a mental one, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." See Social Security Ruling 82-62 (1982); Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994). The ALJ must then determine the individual's ability to return to her past relevant work given her residual functional capacity. Washington, supra, 37 F.3d at 1442.

For depression claims, to determine whether a claimant has an impairment or combination of impairments that meets or exceeds the regulatory standard (for steps 2 and 3 of the assessment), the ALJ has to consider whether certain "paragraph B" criteria, see 20 C.F.R. part 404, Subpart P, Appx. 1, 12.04, para. B, have been satisfied. The qualifying mental

impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration (R. 13, 14).

*Application*

In the instant case, plaintiff challenges the ALJ's finding that she did not have "marked restriction" of activities of daily living. The ALJ found that she only had "mild restriction" in these activities (R. 14). In her response, plaintiff recounts generally several instances of impairment in her daily living activities (Docket No. 17, Pl. Memo. 2-4).

First, plaintiff contends that the ALJ did not conduct a complete credibility analysis. She disputes certain discrepancies the ALJ relied upon to find that she was less than credible. (Docket No. 17, Pl. Memo. at 4-6). Next, she claims that the ALJ did not give proper weight to her treating physician's opinions (id. at 6-8).

I.   Credibility Assessment

From review of the record before the ALJ, he could properly discount plaintiff's view of her condition and conclude that she did not reach the level of "marked restriction" due to her depression to be impaired. She managed a household with three children while taking medication for her depression and engaging in therapy. When she did not take her medication her symptoms worsened.

Plaintiff complains that, as an example of her inconsistency, the ALJ noted plaintiff's express reasons for her termination (Docket No. 17, Pl. Memo. at 4, citing R. 16[5]), stating in one instance that she was terminated due to panic attacks while admitting in another instance that she

---

[5]Actual reference is R. 15.

was terminated due to attendance. Her counsel explains that these are not mutually exclusive, citing counsel's experience with other clients that they might not be able to leave their homes and come to work due to panic attacks, concluding that "both factors generally contribute to their termination" (id. at 4-5). Another instance of inconsistency noted by the ALJ (and critiqued by plaintiff, id. at 5) is whether plaintiff attended special education classes or not (R. 15). Plaintiff's counsel discounts the initial statement denying that plaintiff attended special education classes as lacking probative value (Docket No. 17, Pl. Memo. at 5).

Under the Social Security regulations, the determination of disability depends upon the <u>objective</u> medical evidence of symptoms and not merely on a claimant's subjective complaints, 20 C.F.R. § 416.929(a) (see Docket No. 19, Def. Reply Memo. at 1-2). If symptoms suggest a greater restriction of function that can be demonstrated by objective medical evidence, other objective but non-medical evidence is considered, such as claimant's daily activities, dosage of medication taken, precipitating and aggravating factors, id. § 416.929(c)(3) (see Docket No. 19, Def. Reply Memo. at 2).

Here, as discussed below, plaintiff's objective medical evidence does not indicate sufficiently severe symptoms to constitute a disability. Plaintiff's non-medical objective evidence also indicates that her symptoms are not debilitating. While she may bathe frequently or abandon shopping carts, she still manages to function in caring for herself and her three children (including a toddler). The ALJ here did not abuse his discretion in evaluating plaintiff's credibility, see <u>Minns v. Heckler</u>, 750 F.2d 180, 185-86 (2d Cir. 1984) (see id.).

II. Treating Physicians

Plaintiff next contends that the ALJ should have given more weight to the findings of her treating physicians that she was unable to work (Docket No. 17, Pl. Memo. at 6-8). First, she faults the ALJ for discounting Dr. Cirpili's findings because his records were not longitudinally supported, while disregarding that plaintiff was treated in the same facility, the Niagara County Mental Health, by numerous professionals for over five years (id. at 6-7).

As noted by the Second Circuit, "Genuine conflicts in the medical evidence are for the Commissioner to resolve," Veino v. Barnhart, 312 F.3d 578, 587-88 (2d Cir. 2002). The deference usually given to the opinions of the treating physician is not required when those opinions are inconsistent with the substantive evidence, Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). (Docket No. 19, Def. Reply Memo. at 5.)

Plaintiff's treating physician, Dr. Tan, found that plaintiff did not appear to be depressed or anxious (R. 322, 323, 326, 328, 330, 331, 334) and benefitted from medication and therapy (R. 322, 323, 326, 328, 330, 334), but concluded that she is unable to maintain employment (R. 254). He noted that plaintiff's symptoms fluctuated because she skipped medication (R. 326) but her symptoms were controlled when she adhered to her medication schedule (see R. 16; Docket No. 19, Def. Reply Memo. at 4). Dr. Cirpili also found that she could not even perform a low stress job (id. 5-7). Plaintiff's Global Assessment Functioning (or "GAF") scores (of 55 or a little below) indicated only moderate difficulty in social or occupational functioning (id. at 3-4, 6).

Plaintiff criticizes the ALJ's disregard of Dr. Tan's opinion because Dr. Tan stated that plaintiff was stable (Docket No. 17, Pl. Memo. at 7). But Dr. Tan's treating notes from

15

November 24, 2008, indicated that her mood was stable (R. 322), not in the sense plaintiff contends (Docket No. 17, Pl. Memo. at 7) that the condition has not worsened or improved, but in the sense that her mood was not disturbed, noting (R. 322) that she was alert and had "no delusions, hallucinations, self destructive or aggressive feelings or acting out or gross cognitive deficits" (id.). Another reference to plaintiff being "stable" came in Dr. Tan's April 11, 2007, notes wherein he discussed maintaining her medication "on which she has been relatively stable" (R. 326).

Review of her medical record shows that, when she takes her medication, she has little difficulty and that her symptoms arise from stress-related situations (for example, her teenage daughter) (R. 326, 322, 330, 214). Thus, the ALJ did not err in concluding that he could not rely upon the findings of the treating physicians on the ultimate question of whether plaintiff had a disabling condition.

## CONCLUSION

For the foregoing reasons, this Court recommends that the decision of the Commissioner be **ADOPTED**; defendant's motion for judgment on the pleadings (Docket No. 8) should be **granted**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

**Any objections to this Report & Recommendation *must* be filed with the Clerk of this Court *within fourteen (14) days* after receipt of a copy of this Report &**

**Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) (effective Dec. 1, 2009) and W.D.N.Y. Local Civil Rule 72.3(a).  Failure to file objections to this report & recommendation within the specified time or to request an extension of such time waives the right to appeal any subsequent district court's order adopting the recommendations contained herein.**  Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

                                                  /s/ Hugh B. Scott
                                                  Hon. Hugh B. Scott
                                                  United States Magistrate Judge

Buffalo, New York
December 23, 2010